IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 2:12CR0104-MHT-TFM |
| | ) | [wo] |
| PAUL HULSE, SR., | ) | |
| STEVEN P. MOCK, | ) | |
| FRANK J. TEERS | ) | |

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I. INTRODUCTION**

Pursuant to 28 U.S.C. § 636(b)(1) this case was referred to the undersigned United States Magistrate Judge for review and submission of a report with recommended findings of fact and conclusions of law. The defendants, Paul Hulse, Sr. ("Hulse"), Steven Mock ("Mock"), and Frank Teers ("Teers") (collectively "Defendants"), were charged in an indictment on June 6, 2012, with one count of conspiracy to commit wire fraud and financial institution fraud, six counts of wire fraud, and three counts of financial institution fraud (Doc. 1). Pending before the court is a *Motion in Limine* and *Motion to Strike Allegations Regarding Unsuccessful Loan Solicitations from the Indictment* (Doc. 48), *Motion to Strike Allegations from the Indictment* (Doc. 63) and the *Motion to Strike Surplusage from the Indictment* (Doc. 51).

The Court held an evidentiary hearing on the motions on November 13-14, 2012 (Doc.

106, filed November 14, 2012). Based on the evidence presented to the Court, arguments of the parties, and for reasons set forth herein the Magistrate Judge recommends that the District Judge **DENY** the *Motion in Limine* and *Motion to Strike Allegations Regarding Unsuccessful Loan Solicitations from the Indictment* (Doc. 48), *Motion to Strike Allegations from the Indictment* (Doc. 63) and the *Motion to Strike Surplusage from the Indictment* (Doc. 51).

## II. FACTS

The indictment alleges that over a four-year period, Hulse attempted to obtain several large loans based upon false representations that he is wealthy and owns a large bond portfolio. *See* Doc. 77 at 1. Allegedly Mock, in his capacity as an attorney, and Teers, in his capacity as a stock broker, provided prospective lenders with documents and oral affirmations which gave the lending institutions the impression that Hulse owned bonds which he did not own. *Id.* The indictment avers that Hulse did not own any bonds, nor did he possess any significant assets at the time the alleged representations were made to the lending institutions. *See* Doc. 77 at 2. Defendants unsuccessfully solicited four lending institutions between 2003 and 2005. *Id.* In 2005, Federal Land Bank of South Alabama ("Land Bank") lent Hulse a total of $68.5 million involving two loan transactions based upon the alleged false representations.[1] *Id.* In 2007, Defendants were again unsuccessful in the

---

[1] In August of 2005, Land Bank processed a loan to Defendants in the amount of $30 million. Subsequently in December 2005, Land Bank extended Defendants a $90 million line of credit, of which Defendants withdrew $68.5 million and paid off the initial $30 million loan.

solicitation of a $350 million loan from a group of loan brokers. *Id.* Each solicitation allegedly involved communications sent from Defendants in the forms of letters and faxes misrepresenting the financial position of Hulse. *See* Doc 64 at 5-6.

The indictment returned on June 6, 2012, charges the Defendants with one count of conspiracy to commit wire fraud and financial institution fraud (Count 1), six counts of wire fraud (Counts 2-7), and three counts of financial institution fraud (Counts 8-10). *See* Doc. 77 at 2; *see also* Doc. 1.

### III. DISCUSSION

Defendants move to strike the entire portion of the indictment entitled, Manner and Means "Means". While Hulse, Mock, and Teers caption their motions differently they raise identical arguments. The *Motion in Limine* and *Motion to Strike Allegations Regarding Unsuccessful Loan Solicitations from the Indictment* (Doc. 48) rests on the same legal theory as the *Motion to Strike Allegations from the Indictment* (Doc. 63), and similarly with the *Motion to Strike Surplusage from the Indictment* (Doc. 51). The Means portion of the indictment reads:

> **MANNER AND MEANS BY WHICH THE CONSPIRACY WAS CARRIED OUT**
> The manner and means by which the conspiracy was sought to be accomplished included, among others, the following:
>
> **a.  Introduction**
> 5. From in or a3bout August 2003 through in or about June 2007, HULSE, MOCK, and TEERS engaged in an illegal scheme to defraud several financial institutions, including the Bank, out of tens of millions of dollars. To execute this scheme, HULSE made or caused others to make false and fraudulent representations that HULSE controlled a sizeable bond portfolio that could be

pledged as collateral for such loans. In truth and in fact, as HULSE and his co-conspirators well knew, HULSE controlled no such bond portfolio.

6. As part of the scheme, HULSE, MOCK, and TEERS created and sent to the Bank and other financial institutions fabricated and fraudulent documents, such as lists of bonds purportedly owned by HULSE, letters from MOCK stating that HULSE had sufficient bonds to pledge as collateral, and other documents describing H&H, all of which falsely made it appear that HULSE's purported bond portfolio existed and could be pledged as collateral.

7. Through this fraudulent scheme, H&H obtained approximately $68.5 million from the Bank. After H&H received the Bank loan, HULSE, aided by MOCK and TEERS, continued to make false statements both to prospective lenders in an unsuccessful effort to obtain additional loans and to the Bank in an effort to convince the Bank that H&H would repay the loans.

### b. The Unsuccessful Loan Solicitations
#### i. Western National Bank

8. In or about 2003 and 2004, HULSE, TEERS, and MOCK communicated with each other and a Western National Bank ("WNB") official regarding a potential loan with WNB. HULSE falsely represented to the WNB official that he owned or controlled bonds worth more than $300 million. HULSE also caused the WNB official to receive documents in support of those misrepresentations, including a forged brokerage account statement purporting to show HULSE's control of more than $28 million in bonds, a letter signed by MOCK falsely claiming that HULSE had sufficient financial resources for the transaction, and Bloomberg bond quotation documents that HULSE received from TEERS.

#### ii. MetLife

9. From in or about June 2004 through September 2004, HULSE, TEERS, and MOCK communicated with each other and an employee with a division of MetLife, Inc. regarding a potential MetLife loan. During the discussions, HULSE falsely represented to the MetLife employee that he owned a bond portfolio worth hundreds of millions of dollars. MOCK represented to the MetLife employee that TEERS managed HULSE's bond portfolio and that the bonds could be pledged in support of a loan to H&H. TEERS falsely represented to the MetLife employee that TEERS had managed HULSE's portfolio since 1993 and that the value of HULSE's bond portfolio exceeded $700 million.

#### iii. UBS

10. In or about September and October 2004, HULSE communicated with a UBS Securities ("UBS") affiliate's employee regarding a potential UBS loan. During the discussions, HULSE falsely represented that H&H would have at least

$50 million in free and unencumbered government bonds available for a potential loan in October 2004, and HULSE caused the UBS affiliate's employee to receive a list of ten bonds worth $81.7 million, which HULSE falsely represented as the type of bonds HULSE could transfer to UBS.

### iv. Jefferies & Company, Inc.

11. From in or about December 2004 through in or about March 2005, HULSE communicated with a Jefferies & Company, Inc. ("Jefferies") employee regarding a potential Jefferies loan. During those discussions, HULSE falsely claimed to control a bond portfolio that would serve as part of the collateral for the loan, and HULSE emailed the Jefferies employee the same list of $81.7 million in bonds that HULSE had caused the UBS affiliate's employee to receive.

### v. The 2007 Unsuccessful Loan Solicitation

12. In or about the Winter and Spring of 2007, after the loan transactions with the Bank described in paragraphs 13 through 35 of this Indictment, HULSE and MOCK communicated with each other and a group of loan brokers regarding a potential loan. During those discussions, HULSE falsely represented that he had a large portfolio of bonds that could be used to secure such a loan, and MOCK faxed a letter to one of the loan brokers falsely stating that based on MOCK's "own knowledge," H&H had sufficient bonds to collateralize a $350 million loan.

### c. The First Bank Loan

13. In or about February 2005, HULSE spoke by telephone with a loan officer for the Bank ("Loan Officer") to discuss a potential loan that would finance HULSE's purchase of land in Canada. During the conversation, HULSE falsely represented that he had a large bond portfolio that could be used as collateral for the loan. Shortly thereafter, HULSE contacted Loan Officer and initiated discussions about a loan (the "First Loan") in the amount of approximately $25 million that would finance the purchase of timberland in the United States.

14. In early March 2005, Loan Officer traveled to Houston and met with HULSE and TEERS. During that visit, HULSE falsely represented that he controlled a large portfolio of bonds that could be used to collateralize a loan, and TEERS falsely represented that he managed a substantial bond portfolio for HULSE.

15. On or about March 14, 2005, Loan Officer emailed to HULSE a memo dated March 12, 2005 titled "Potential Lending Relationship," which proposed a $30 million line of credit to be established in favor of H&H, which H&H could use to purchase and improve timberland or other agricultural real estate. The proposal provided that H&H would pledge bonds as collateral for a portion of the loan. Loan Officer also requested that HULSE "provide a detailed description, narrative, chart, etc. that will help Lender to understand the overall nature of the financial holdings

and businesses."

16. On or about March 17, 2005, HULSE faxed Loan Officer a purported "narrative" of HULSE's business stating, among other materially false and misleading claims, that (a) HULSE entered the bond business in the early 1990s, and (b) after making money his first year, HULSE "stayed in bonds to the present day." HULSE also stated that H&H intended to use the First Loan proceeds to buy coal-producing land in Kentucky, to purchase equipment, to pay salaries, and to provide general working capital. HULSE did not disclose the material fact that he intended to use the First Loan proceeds to purchase the bonds he had falsely represented he already owned and which would be the purported collateral for the First Loan.

17. On or about March 24, 2005, Loan Officer emailed HULSE, stating: "Bond Verification Letter: Paul for the purposes of my credit due diligence please have your broker/bond attorney provide independent verification of up to $18 million of AAA Securities."

18. On or about March 28, 2005, MOCK wrote a letter (the "MOCK Letter") to Loan Officer, stating, among other materially false and misleading representations, that (a) MOCK was the "Senior Trust Officer" for HULSE "and his various companies," and (b) the transfer of two specified bonds with a total value of $15 million "from the trust" to H&H "is permitted under the conditions of the trust Agreements."

19. On or about March 28, 2005, TEERS emailed HULSE documents from the Bloomberg quotation system relating to three bonds, two of which were the bonds referred to in the MOCK Letter.

20. On or about March 29, 2005, HULSE emailed Loan Officer copies of two of the Bloomberg documents that TEERS had emailed on March 28. The two documents referenced the same bonds referred to in the MOCK Letter. HULSE wrote that the documents were "the worksheets for bonds sent." HULSE failed to disclose the material fact that he neither owned nor controlled the bonds referred to in the MOCK Letter.

21. In early April 2005, the Bank approved the First Loan up to a maximum amount of $30 million. As described below, the First Loan closed in August 2005.

22. On or about June 15, 2005, two IRS-CI special agents interviewed TEERS. Among other things, during the interview, the agents (c) showed TEERS the forged brokerage statement referred to in paragraph 8 of this Indictment; (d) advised TEERS that by going to prospective lenders and representing that HULSE

owned the bonds referred to in Bloomberg printouts, TEERS could be committing bank and securities fraud; and (e) told TEERS that several witnesses had reported that HULSE was claiming to own the bonds in question. TEERS failed to disclose what occurred at the June 15 interview to either (a) his superiors at Tri-Star, (b) Tri-Star's attorney, or (c) Loan Officer or any other Bank official.

23. On or about August 13, 2005, Loan Officer, on behalf of the Bank, and an H&H officer, on behalf of H&H and a subsidiary, signed a document titled "Revolving Line of Credit" (the "RLOC Agreement"), which set forth the terms of the First Loan. The RLOC Agreement provided, among other things, that H&H would not (a) "pay or declare any dividends" except to the extent it had made a profit, (b) "make any loans to any other party," or (c) "make any other distribution of any of [H&H's] assets, properties, or business other than in the ordinary course of business." At the time, HULSE knew that, contrary to the terms of the RLOC Agreement, H&H intended to divert a substantial amount of the First Loan proceeds for his own use and enjoyment, including personal expenses and loans to his own family members.

24. On or about August 18, 2005, TEERS, on behalf of Tri-Star, signed a document titled Pledge and Security Agreement and Control Agreement (the "Pledge Agreement"). In the Pledge Agreement, Tri-Star represented that certain bonds are "on deposit in the Account as of the date of this Agreement." TEERS knew and failed to disclose to the Bank the material fact that H&H owned no bonds and intended to use the First Loan proceeds to buy the bonds being pledged as collateral.

25. On or about August 18, 2005, after TEERS had executed the Pledge Agreement, the Bank authorized the distribution of the $30 million in loan proceeds by an attorney in Virginia. Among other things, the Virginia attorney caused approximately $22,892,079.04 to be wire transferred to two separate H&H accounts that had been established at Tri-Star: $16 million into a collateral account (the "H&H Collateral Account"), and $6,892,079.04 million into an operating account (the "H&H Operating Account"). Prior to the transfer of the First Loan proceeds, these accounts had no assets.

26. On or about August 22, 2005, TEERS used the $16 million that had been transferred to the H&H Collateral Account to purchase the bonds that were supposed to serve as collateral for the First Loan and that TEERS had falsely claimed in the Pledge Agreement that H&H already owned. A substantial amount of the remaining funds in the H&H Operating Account was used for the personal benefit of MOCK, HULSE, and members of the HULSE family.

        d.       **The Second Bank Loan**

27. On or about October 30, 2005, HULSE caused to be faxed to Loan Officer a document titled "Loan Proposal" in connection with a proposed $60 million loan (the "Second Loan"), which H&H would purportedly use (a) to finance H&H's purchase of two parcels of land for a total purchase price of $7,850,000, (b) for working capital, and (c) to develop and expand the site. The collateral for the Second Loan would be the "assets being acquired; plus US Government securities" estimated at $25 million. HULSE failed to disclose the material fact that neither he nor H&H owned any bonds (other than those bought with the proceeds of the First Loan) and that H&H would be using a substantial portion of the Second Loan proceeds to buy the bonds that would serve as collateral for the Second Loan.

28. On or about November 14, 2005, HULSE caused to be faxed to Loan Officer a document that falsely stated H&H would use the entire $60 million in Second Loan proceeds for "Purchase of Properties," "Approvals & Permits," "Engineering," "Marketing," "Administration," "Consultants," and "Working Capital." HULSE failed to disclose the material fact that a substantial portion of the Second Loan proceeds would be used to buy the bonds that would serve as collateral for the Second Loan.

29. On or about November 16, 2005, the Bank approved the Second Loan in the amount of $90 million, $30 million of which would be used to repay the First Loan, with the remaining funds to be used to develop the proposed real estate project described above.

30. On or about December 14, 2005, Loan Officer, on behalf of the Bank, and an H&H officer, on behalf of H&H and two subsidiaries, signed a document titled "Amended and Restated Revolving Line of Credit Agreement" (the "Amended RLOC Agreement"). The Amended RLOC Agreement contained provisions limiting the use of the loan proceeds identical to those in the original RLOC Agreement.

31 On or about December 14, 2005, TEERS, on behalf of Tri-Star, signed a document titled "Amended and Restated Pledge and Security Agreement and Control Agreement" (the "Amended Pledge Agreement"). The Amended Pledge Agreement contained a provision relating to the fact that certain bonds were on account identical to the provisions in the original Pledge Agreement. TEERS both knew and failed to disclose to the Bank that H&H did not own any bonds (other than those previously purchased with the First Loan proceeds) and would only be able to acquire the additional bonds being pledged as collateral by using the Second Loan proceeds.

32. On or before December 14, 2005, HULSE caused to be submitted to the Bank what purported to be a financial statement for October 2005 that overstated the amount of H&H's cash and securities by more than $14 million.

33. On or about December 15, 2005, the Bank allowed H&H to draw $68.5 million on the $90 million line of credit, with $30 million being used to repay the First Loan.

34. Between on or about December 16, 2005 through on or about December 29, 2005, TEERS used approximately $20 million of the Second Loan proceeds to purchase the bonds that would serve as collateral for the Second Loan. Approximately $9,375,040.33 of the loan proceeds were transferred to the H&H Operating Account, and H&H used a substantial amount of these funds for the personal benefit of HULSE and members of his family.

35. Between in or about August 2005 and July 2007, Tri-Star earned approximately $1,095,000 in commissions from the purchase and sale of bonds on behalf of H&H. TEERS's share of these commissions totaled in excess of $600,000.

**(e)  False Statements Regarding Refinancing and Use of Proceeds**

36. The Amended RLOC Agreement provided that the interest earned on the pledged bonds during a particular calendar quarter needed to be sufficient to cover the quarterly payment due on the loan, and, if it were not, the Bank could demand that H&H deposit additional bonds into the H&H Collateral Account. Notwithstanding these provisions, on or about June 26, 2007, the Bank sent a letter to MOCK advising H&H that the Bank would consider a proposal by H&H to make the July 1 Payment in part by using principal from the bonds in the H&H Collateral Account, in addition to the interest that had been earned on those bonds. The Bank's letter stated that any such proposal would have to include, among other things, "a written summary of [H&H's] present effort to refinance the loan," and "a detailed reconciliation setting forth the expenditure of all loan proceeds received from the Lender."

37. On or about June 28, 2007, MOCK responded with a letter with exhibits (the "June 28 Letter") signed by HULSE and an H&H officer under the following statement: "The above letter, and all Exhibits thereto, have been reviewed by the undersigned, and are, to the personal knowledge of each party whose signature appears below, true and correct." Exhibit 2 to the June 28 Letter falsely claimed that H&H was "at the doorstep" of completing a new loan transaction with Wells Fargo's Energy Division. Exhibit 5 to the June 28 Letter falsely stated that H&H had used the loan proceeds for only three purposes, namely (a) purchasing properties, (b) developing properties, and (c) "[f]urther development of [H&H] . . . and affiliated organizations." Exhibit 5 omitted the material facts that more than half of the Bank's loan proceeds were used to purchase the bonds that were serving as collateral and that a substantial amount of the loan proceeds were used for personal expenses of HULSE, MOCK, and members of the HULSE family.

All in violation of Title 18, United States Code, Section 1349.

*See* Doc. 1 at 3-12.

Mock alleges the Means portion must be struck as they are unnecessary to prove the crime. *United States v. Miller*, 471 U.S. 130, 136-137 (1985). In addition, Mock posits the allegations are prejudicial and inflammatory. *See* FED. R. CR. P. 7(d); *United States v. Goodman*, 285 F.2d 378, 379 (5th Cir. 1960); *United States v. Graves*, 5 F.3d 1546, 1550 (5th Cir. 1993). Rule 7(d) states that "[u]pon the defendant's motion, the court may strike surplusage from the indictment or information." FED. R. CR. P. 7(d). "A motion to strike surplusage from an indictment should not be granted unless it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial. This is a most exacting standard." *United States v. Awan*, 966 F.2d 1415, 1426 (11th Cir. 1992) (internal quotations and citations omitted).

The Magistrate Judge rejects the arguments for three reasons. First, the Means portion sets out transactions which were allegedly part of the *res gestae* of the conspiracy. *United States v. Ben-Ari*, 2010 WL 10149197, *2 (M.D. Fla. Mar. 22, 2010); *Unites States v. Muscatell*, 42 F.3d 627, 630 (11th Cir. 1995).

Second, the allegations are, if true, relevant to the conspiracy and on their face not inherently inflammatory or prejudicial. *United States v. Huppert*, 917 F.2d 507, 511 (11th Cir. 1990); *United States v. McGregor*, 2011 WL 1362102, *1 (M.D. Ala Apr 11, 2011). Indeed, the allegations merely pertain to acts central to and in furtherance of an illegal

conspiracy. Nothing in the allegations are so prejudicial that a jury could not return a verdict based on evidence and the logical inferences to be drawn from the evidence. Motions to strike surplusage are proper when it is clear the allegations are not relevant to the charge and are inflammatory and prejudicial. *United States v. Huppert*, 917 F.2d 507, 511 (11th Cir. 1990).

Finally, the Magistrate Judge concludes from the representations of the parties in pretrial conferences, hearings, and pleadings that the alleged criminal conduct stretches back more than 8 years, discovery in the case consists of thousands of pages which will likely translate into more than a hundred exhibits, and the alleged scheme to defraud is complex and will likely take two to three weeks to try. The indictment, particularly the manner and means portion, may be helpful to the jury to keep track of any role the various alleged co-conspirators may have held and the means if any used to carry out the conspiracy. *See United States v. Johnson*, 584 F.3d 731, 736 (7th Cir. 2009).

### IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the District Judge **DENY** the *Motion in Limine* and *Motion to Strike Allegations Regarding Unsuccessful Loan Solicitations from the Indictment* (Doc. 48), *Motion to Strike Allegations from the Indictment* (Doc. 63) and a *Motion to Strike Surplusage from the Indictment* (Doc. 51).

It is further ORDERED that the Defendants file any objections to this Recommendation on or before **December 28, 2012**. Any objections filed must specifically

identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *see Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

DONE this 17th day of December, 2012.

/s/ Terry F. Moorer  
TERRY F. MOORER  
UNITED STATES MAGISTRATE JUDGE